FILED
2025 Sep-04  AM 11:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | |
|---|---|
| WILLIAM MCCARTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 5:24-CV-00973-HNJ |
| | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| COMMISSIONER, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff William McCarty seeks judicial review pursuant to 42 U.S.C. § 406(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding his claim for a period of a disability and disability insurance benefits. (Doc. 1). The undersigned carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. §636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 16).

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon a claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11ᵗʰ Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities…" *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  See *id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education, and past work experience, that the claimant can perform other work. 20 C.F.R. §§ 404.1512(b)(3) 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* § 404.1520(a)(4)(v), ; *see also* 20 C.F.R.

§ 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings… 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole… to determine if the decision reached is reasonable… and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence… is 'more than a mere scintilla,' … [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted).  Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

McCarty, age 66 at the time of the ALJ hearing, filed an application for disability and disability insurance benefits on January 27, 2022, alleging disability as of January 1, 2022. (Tr. 47, 192-94). The Commissioner denied McCarty's application initially and upon reconsideration. (Tr. 58-82, 88-92, 99-103). McCarty timely filed a request for an administrative hearing. (Tr. 111-12). The Administrative Law Judge ("ALJ") held a hearing on September 14, 2023. (Tr. 30-53).

The ALJ issued an unfavorable decision denying McCarty's claim on December 12, 2023. (Tr. 12-24). Applying the five-step sequential process, the ALJ found at step one that McCarty had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 17). At step two, the ALJ determined McCarty had severe impairments of osteoarthritis, cervical and lumbar degenerative disc disease, major depressive disorder, post-traumatic stress disorder (PTSD), and personality disorder. (*Id.*).

At step three, the ALJ concluded McCarty did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments – specifically, sections 1.15 (disorders of the skeletal spine resulting in comprise of a nerve root), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equine), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and

obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma and stressor-related disorders) – in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18).

> At step four, the ALJ found McCarty exhibited the RFC to
>
> perform medium work as defined in 20 C.F.R. 404.1567(c) except frequently balance, stoop, kneel, crouch and crawl; never climb ladders, ropes, or scaffolds; have no concentrated exposure to temperature extremes or vibration and no working at unprotected heights or around unguarded moving machinery. He can have occasional interaction with co-workers and supervisors; maintain concentration, persistence, and pace for simple routine tasks; and tolerate occasional workplace changes.

(Tr. 19). In so finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id.*). To this end, the ALJ found that while "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms…the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20). Given the afore-cited RFC, the ALJ deemed McCarty unable to perform any past relevant work since the alleged onset date. (Tr. 23).

However, at step five, the ALJ determined, based on testimony from a vocational expert at the hearing, that jobs exist in significant numbers in the national economy that McCarty could perform given his age, education, work experience, and residual functional capacity, including assembler, machine packager, and store laborer (Tr. 23-24, 50). Therefore, the ALJ determined McCarty "was not under a disability, as defined

in the Social Security Act, at any time from January 1, 2022, the alleged onset date, through June 30, 2023, the date last insured." (Tr. 24).

McCarty filed a request for review of the hearing decision. (Tr. 188-89). On May 21, 2024, the Appeals Council denied McCarty's request to review, which deems the ALJ's decision the Commissioner's final decision. (Tr. 1-6).  McCarty filed his Complaint in the present case on July 19, 2024. (Doc. 1).

## ANALYSIS

In this appeal, McCarty argues the ALJ's determination does not rest on substantial evidence. (Doc. 9, at 1-2).  Specifically, McCarty contends "the Commissioner erred as a matter of law in determining he is not entitled to SSDI [Social Security Disability Insurance] benefits and issued a decision that was not based on substantial evidence and is inconsistent with applicable law." (*Id.*). Moreover, he claims the ALJ "failed to properly evaluate the credibility of [his] complaints of pain consistent with the Eleventh Circuit Pain Standard." (*Id.* at 5). For the reasons stated herein, the undersigned concludes those contentions do not warrant reversal.

To determine if a claimant can perform his past relevant work at step four or other work at step five, the ALJ must assess the claimant's RFC — the most a claimant can still do despite the physical and mental limitations resulting from the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e); *Phillips v. Barnhart*, 357 F. 3d 1232, 1238 (11th Cir. 2004) (*superseded by statute on other grounds as stated in Portwood-Braun v. Commissioner of Social Security*, No. 22-11491, 2023 WL 2417856 (11th Cir. Mar. 9,

2023)).  The ALJ must base the decision on all relevant evidence in the record, including

medical signs and laboratory findings, the effect of treatment including limitations or

restrictions imposed by the mechanics of treatment (e.g., frequency, duration,

disruption to routine, and side effects of medication), daily activities, lay evidence,

recorded observations, and medical source statements. *See* SSR 96-8p, 1996 WL 374184

at *5 (1996); 20 C.F.R. § 404.1545(a)(3).

> A three-part "pain standard" applies when a claimant attempts to
> establish disability through her own testimony of pain or other subjective
> symptoms. *Wilson*[ *v. Barnhart*], 284 F.3d [1219,] 1225[ (11ᵗʰ Cir. 2002)].
> The pain standard requires evidence of an underlying medical condition
> and either objective medical evidence that confirms the severity of the
> alleged pain arising from that condition or a showing that the objectively
> determined medical condition is of such severity that it can be reasonably
> expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11ᵗʰ Cir. 2021).  A

claimant's testimony, coupled with evidence that meets the pain standard, suffice "to

support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11ᵗʰ Cir. 1991)

(citations omitted).

Social Security Ruling ("SSR") 16-3p eliminates the use of the term "credibility"

as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will

consider any personal observations of the individual in terms of how consistent those

observations are with the individual's statements about his or her symptoms as well as

with all the evidence in the file." SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017). An

ALJ rendering findings regarding a claimant's subjective symptoms may consider a

variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p also clarifies the ALJ's burden when discrediting a claimant's subjective symptoms:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough…simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

2017 WL 5180304 at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

At the September 14, 2023, evidentiary hearing, McCarty testified that he worked at Walmart as a clerk and cart pusher for eleven years. (Tr. 36, 216, 261).[2] McCarty testified he decided to retire because the repetitiveness of the job caused him to feel mentally and physically "burned out." (Tr. 39-40). When asked about the symptoms

---

[2] McCarty stated consistent information in his work history reports. (Tr. 216, 261).

associated with his physical and mental health, McCarty replied, "[He] was just…stressed to the bone." (Tr. 40). Describing his alleged symptoms of physical pain, McCarty testified experiencing "pain in [his] neck," as "one of [his] cervical connections in [his] neck sometimes [will] act up." (Tr. 45).  As of the date of the hearing, McCarty stated he takes "some" Atorvastatin and gabapentin "sometimes." (Tr. 42). However, he then stated, "I don't take it that regularly. I prefer not to take any medicine really." (*Id.*). Further, McCarty does not take any medication for his mental health. (Tr. 41-42). McCarty explained he could stand or walk for about 20 minutes before stopping to rest. He estimated he could lift and carry 10 – 20 pounds comfortably. (Tr. 46-47).

McCarty also testified about his mental health during the evidentiary hearing. McCarty's diagnosis included major depressive disorder, PTSD, and personality disorder. (Tr. 43). When asked to sum up his symptoms, he stated that his cats help with his anxiety, and he can relate to "a couple of friends." (*Id.*). When his attorney gave him examples of PTSD symptoms, such as flashbacks or nightmares, McCarty stated that he "sometimes" experiences these symptoms. (*Id.*). McCarty also reported experiencing trouble concentrating, and he "think[s]" he has more problems with concentration at that time than in the past. (*Id.*).  In addition, McCarty stated he "tries" to get along with his neighbors, but the neighbors affect his nervous system because their boom cars make too much noise. (Tr. 45).

In his opinion, the ALJ assessed McCarty's residual functional capacity as "more consistent with the appropriate medical findings and the overall evidence of record than

the allegations made by the claimant." (Tr. 23). The ALJ relied upon Function Reports and consultative findings indicating that McCarty performs his housework and daily living activities independently, takes care of his neighbor when needed, visits his friends regularly, and pays attention for two hours at a time. (Tr. 21-22, 229-32, 250-53, 494, 504-05). In addition, the ALJ cognized that physical therapy relieved McCarty's shoulder pain; McCarty does not take any narcotic prescription medications; he has not received any injections or surgery; and he does not use any assistive devices to ambulate. (Tr. 18, 21). Further, the ALJ noted that McCarty characterized his mental health symptoms as "manageable without medication," and he described himself as "a purist," indicating McCarty does not want chemicals in his body. (Tr. 21). Nevertheless, the ALJ noted McCarty had requested Valium or Placidyl, which now constitutes a street drug. (*Id.*). McCarty did not consistently attend his mental health appointments as recommended, and a mental health provider prescribed medication to McCarty in June 2022, yet McCarty did not return to that provider until February 2023. (*Id.*).

The ALJ adequately articulated these findings, and substantial evidence supports his findings.

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATON REGARDING MCCARTY'S RFC AS TO HIS PHYSICAL AILMENTS

In determining whether a claimant was disabled under the aforementioned pain standard, an ALJ may consider evidence from before or after the relevant period between the alleged disability onset date and the date last insured, so long as the

information bears on the claimant's disability during the relevant time. *Douglas v. Commissioner of Soc. Sec.*, 486 F. App'x 72, 75 (11th Cir. 2012) ("[The ALJ] properly applied this circuit's pain standard, taking into account evidence during the relevant period. He also considered evidence from before and after the relevant period that would have bearing on Douglas's disability during the relevant time."). To this end, the full medical record – including records pre-dating the alleged onset date and post-dating the date last insured – demonstrates McCarty's symptoms stemming from his osteoarthritis, cervical and lumbar degenerative disc disease, major depressive disorder, personality disorder, and PTSD remained relatively controlled throughout the relevant period.

On August 20, 2021, McCarty visited The Orthopaedic Center with complaints of generalized pain, which increased with activity but did not exceed level five out of ten. McCarty also complained of swelling in his legs/feet, joint and muscle pain, nervousness and depression, headaches, dizziness, and numbness/tingling. McCarty exhibited a good range of motion in both hips, his lumbar spine, and his shoulder, albeit with mild pain in that area. The physician ordered X-rays, which did not depict evidence of any problems. Upon discharge, the physician prescribed physical therapy, placed McCarty on Mobic, and instructed him to return in six weeks. (Tr. 308-09).

Decatur Morgan Hospital (hereinafter "DMH") records reflect consistent findings. On November 17, 2021, McCarty complained of left posterior shoulder pain, yet he reported  no numbness, weakness, or abdominal or chest pain. McCarty appeared alert during the physical exam, displaying a normal range of motion and a

normal mood. Upon discharge, the emergency room staff administered an intramuscular dose of Toradol and prescribed a short course of Flexeril. The physician instructed McCarty to follow up with his primary care physician in the following two to four days (Tr. 392-94).

McCarty returned to DMH five days later, on November 22, 2021, for male genitourinary issues. During the physical exam, the physician noted a normal inspection of his back and a full range of motion in his neck. (Tr. 386-88).

On December 15, 2021, McCarty returned to DMH.  The physical exam reflected a full range of motion in his neck and extremities, as well as a normal inspection vis-à-vis his back. (Tr. 379-81).

On March 3, 2022, McCarty visited Dr. Punuru J. Reddy, his primary care physician, for a general multisystem exam. (Tr. 414). McCarty complained of chronic neck pain and benign prostatic hyperplasia (BPH) symptoms. (*Id.*). Dr. Reddy described all of McCarty's systems as normal, except for trouble with urination, joint pain, and feeling down, depressed, or hopeless. (*Id.*).

On April 20, 2022 – about three months after the alleged onset date – McCarty filled out a Function Report form. (Tr. 228). He indicated that stress limits his ability to work. (*Id.*). McCarty's reported daily activities included feeding his cats, making his bed, and washing his clothes, among other tasks. (Tr. 229). He noted caring for his cats independently, such as transporting them to vet appointments and showing them affection. (*Id.*). He performs household chores, both indoors and outdoors, "at his own

pace." (Tr. 230). In addition, he recounted going outside daily, and shopping for groceries and clothes every other day for an hour. (Tr. 231-32). When asked about any changes in the abilities he manifested prior to his illness, McCarty wrote, "My interests do not include being with many people, … the constant stress is very oppressive." (Tr. 229). He also reported he "associate[s]" with an elderly neighbor. (*Id.*). However, McCarty reported later in the same report that he socializes with friends at restaurants every other week. (Tr. 232). Further, he notes having problems getting along with his friends and family, specifically his brother-in-law, a past professor, and his second spouse (from whom he is divorced). (*Id.*).

McCarty reported difficulty lifting, squatting, bending, reaching, talking, completing tasks, concentrating, remembering, and getting along with others. (Tr. 233). He explained he could walk two miles before needing to stop and rest for 10 minutes. (*Id.*). He observed he does not handle stress well, and noises bother him. (Tr. 234).

On June 16, 2022, McCarty visited Decatur Orthopaedics Clinic (hereinafter "DOC") complaining of level-five pain in his right shoulder from a work injury on December 5, 2021. He reported that the pain radiated into his neck and manifested as a constant, dull pain when pulling, reaching overhead, and performing repetitive actions. McCarty indicated he took Mobic to relieve his pain. In addition, McCarty complained of feeling anxious and depressed. (Tr. 333). The exam notes characterized McCarty as pleasant, oriented, and cooperative, with good strength and normal range of motion in his right shoulder. (Tr. 335). As a result, the physician recommended

physical therapy for his shoulder rather than continuing an anti-inflammatory medication, and he scheduled a follow-up appointment after four weeks. (*Id.*).

During McCarty's physical therapy on June 22, 2022, he denied pain in either shoulder. (Tr. 331). Further, the therapist noted that McCarty appeared "much more concerned about his mental conditions than physical." (*Id.*). On June 24, 2022, McCarty stated he felt "some better after treatment," and he could not pinpoint any pain during the session. (Tr. 457). McCarty asked the physical therapist to complete his Social Security Disability forms, but the physical therapist advised McCarty to request a medical doctor to complete them. (*Id.*). The physical therapist's objective findings stated McCarty needed constant verbal cues to stay focused, yet he performed the exercises properly. (Tr. 458). He also stated McCarty wanted to talk more than exercise. (*Id.*). The physical therapist also assessed that McCarty had increased complaints of pain in his right shoulder, yet he tolerated treatment well. (Tr. 458).

McCarty reported to physical therapy on June 27, 2022, without complaints of pain but very fixated on his mental health. Yet, McCarty also stated he only felt pain in his posterior shoulder. The therapist noted no complaints of pain with the exercises. The physical therapist's assessment stated McCarty required maximum cues for correct performance of exercises because of his poor attention to the task presented. (Tr. 459-60).

On July 1, 2022, McCarty attended his fourth physical therapy treatment. He complained about his mental health, and he gave vague complaints of pain, though he

reported feeling somewhat better.    In addition, he remarked his right shoulder presented more discomfort than his cervical spine.  The therapist noted McCarty tolerated treatment well. (Tr. 461).

On July 6, 2022, McCarty complained to the physical therapist of pain in his neck and lower back. (Tr. 463). McCarty stated his pain levels range from a minimum of three to a maximum of eight on a scale of one to ten, which is consistent with his previous report from June 22, 2022.   On that date, as on June 22, he experienced level-three pain.   The therapist noted his ability to perform prescribed exercises, with his pain increasing at the end range in his cervical spine.  The therapist also reiterated McCarty's fixation on his mental health. (Tr. 463-6).

Two days later, on July 8, 2022, McCarty returned to physical therapy and reported his "neck hurt[ ]" that day, and he did believe he slept well.  (Tr. 465). McCarty rated his pain as a four out of ten, and he needed maximum cuing to perform the exercises correctly. (Tr. 466).

On July 11, 2022, McCarty reported to DMH with complaints of pain in his right foot.  McCarty stated he stepped on a nail about three months prior, and for the past three days, he felt pain where the nail entered his foot.  X-rays portrayed evidence of osteoarthritis and chronic Achilles tendonitis with calcification. (Tr. 359).

During a physical therapy session on July 13, 2022, McCarty rated his neck and shoulder pain at level three.  The therapist observed that McCarty still experienced pain in his shoulder and neck, and he expressed concerns about his mental and physical

health.  However,  McCarty exhibited no limitations in his range of motion, and his pain did not increase during exercise. (Tr. 467-687).

On July 15, 2022, McCarty reported to his physical therapist that he did not have any pain that day, and he performed his exercise program without difficulty.  The physical therapist noted McCarty anxiously walked around the waiting room and changed seats several times.  McCarty had difficulty pinpointing pain, and he denied any pain in his right shoulder. (Tr. 469-70). The physical therapist and McCarty agreed upon his discharge from physical therapy. (Tr. 471). McCarty continued to fixate on his mental health, but according to the discharge forms, McCarty felt no pain, classified his functional improvement as "excellent," and completely met his goals. (Tr. 472). He experienced no more than mild difficulty with any listed functional activities. (*Id.*).

On August 8, 2022, McCarty presented himself to Dr. Reddy for a follow-up about his prior complaints of pain in his right foot and swelling in his toes.  Dr. Reddy noted McCarty visited the emergency room twice before the appointment.  Dr. Reddy acknowledged the possibility a foreign body lodged between McCarty's first and second toes, and he did not believe McCarty had gout.  Dr. Reddy referred McCarty to another physician and gave him medication upon discharge. (Tr. 410-13).

On August 23, 2022, McCarty presented at DOC for another evaluation of his right foot.  He stated that he stepped on a nail in March 2022, and his foot continued to bother him despite several rounds of antibiotics. (Tr. 420). During the physical exam, , Dr. Justin M. Daigre, located a hardened area of tissue where McCarty felt the most

tenderness.  Dr. Daigre noted the range of motion in McCarty's MTP joints appeared well, his skin presented no issues, and the area displayed no signs of swelling.  Upon review of X-rays, Dr. Daigre observed "what looks like maybe a very small metallic object seen in the soft tissue of the 1st web space." (Tr. 422).  Dr. Daigre scheduled an MRI for August 29, 2022. (Tr. 518).

On September 2, 2022, McCarty returned to DOC for MRI results. (Tr. 429). The MRI displayed no acute abnormalities and no foreign body in McCarty's foot.  Dr. Daigre opined scar tissue created the hardened mass, and even if he surgically removed it, it would likely return.   Dr. Daigre prescribed physical therapy to relieve the pain in McCarty's foot, and he recommended massages and pain modalities to desensitize the area. (Tr. 430).

McCarty attended a physical therapy appointment for his foot on September 12, 2022.  (Tr. 442). He reported "not much" pain while walking or resting. (*Id*.). Even so, he experiences an "occasional slight rare shooting pain." (*Id*.). On the day of the therapy session, he reported level zero pain, and his worst pain was level six.  (*Id*.). The physical therapist noted no functional limitations (Tr. 443). On a patient outcome report, McCarty reported level three pain and only "a little bit of difficulty" with functional tasks. (Tr. 445).

McCarty returned to physical therapy on September 20, 2022. (Tr. 450). He reported "he ha[d] been working on his scar massage, 'but not as much as I should have.'" (*Id*.). McCarty denied any pain, but he felt some numbness in the area. (*Id*.).

Because McCarty verbalized his understanding of how to perform the scar massage, the report indicated he met and completed the proposed physical therapy goals. (Tr. 451). Upon discharge, McCarty tendered a completion of care report. (Tr. 453). He reported he felt "very satisfied" upon discharge; he had excellent functional improvement, and he completely met his goals. (*Id.*). He reported level-one pain and only "a little bit of difficulty" with functional tasks. (*Id.*).

McCarty filled out another Function Report form on October 24, 2022. (Tr. 249). He declared his conditions limited his ability to work because of the "stress and the menial work around crowds of people," as well as limits imposed by "anxiety and depression." (*Id.*). McCarty listed his typical daily activities as staying home, maintaining his household, washing his clothes and sheets, warming up food, and caring for his cats. (Tr. 250). McCarty stated he can perform house and yard work, such as mowing the lawn and performing light repairs. (Tr. 251). He felt more relaxed and ready for work prior to the onset of his conditions. (Tr. 250). He described his sleep as "sporadic" due to prostate problems, mental stress, and grieving. (*Id.*). McCarty reportedly enjoys "meals that are easy to fix" or dining out. (Tr. 251). He "enjoy[s] nature" and goes outside "often." (Tr. 252). McCarty shops in stores for groceries and cat food every three days for around 30 minutes and continues to enjoy his hobbies and interests every day. (Tr. 252-53). He listed going out to lunch with others and talking on the phone as two of his daily activities. (Tr. 253). McCarty reported difficulty lifting, squatting, standing, walking, talking, hearing, seeing, remembering, completing tasks,

concentrating, understanding, following instructions, and getting along with others. (Tr. 254). He explained he could walk one mile before needing to stop and rest for 20 minutes. (*Id.*).

On April 6, 2023, Dr. Marlin D. Gill conducted a disability exam. Dr. Gill reported McCarty came unaccompanied to the appointment. Dr. Gill also noted McCarty provided his personal medical history and described him as a "very poor historian." (Tr. 494). McCarty stated that he cannot work due to the pain in his lower back, which began when he fell in sixth grade. He complained then of intermittent lumbar pain that occurred daily at random times, and the pain increased while standing, walking, and bending. The exam referred to an MRI from 2015 that exhibited degenerative disc disease in the lumbar region with bulging discs and osteophytes at L2-L5, a prescription for meloxicam for pain, and a prescription for gabapentin for sleep. McCarty also complained of neck pain, which manifested approximately 12 years in the past. He stated that emotional stress causes the pain. Further, McCarty noted that "[i]t doesn't hurt any other time," but the pain occurs frequently because he constantly experiences emotional stress. (*Id.*). The exam also notes McCarty's neck pain "has never been evaluated." (*Id.*).

McCarty detailed that the joint pains all over his body "seem to move around every day." (*Id.*). He remarked his joints hurt when he uses them "a lot," yet he could not specify any further information. (*Id.*). McCarty also claimed a doctor "told him in

the past he has osteoarthritis." (*Id.*).  He reported sitting most of the time at home, but he gets up and down to do housework. (Tr. 494).

During the physical exam, McCarty appeared well-developed and nourished. (Tr. 495). McCarty's eyes, ears, neck, chest, cardiovascular system, and abdomen appeared normal.  Dr. Gill noted multiple normal findings during his exam of McCarty's musculoskeletal system, yet he noted McCarty's complaint with his cervical movement and discomfort with his lumbar movement.  McCarty's gait, neck, range of motion in joints, strength, hands, back, legs, and muscle tone appeared normal.  McCarty could walk unassisted, alighted on and off the exam table without assistance, bent and rotated normally, and squatted all the way down and back up.  Dr. Gill also noted McCarty could walk on his tiptoes and heels.  Upon review of McCarty's cervical spine X-ray, Dr. Gill noted the presence of multilevel degenerative disc disease and classified the severity as "moderate to severe from C5-C7 and mild at the other levels." (*Id.*).

State agency examiner Prianka Gerrish, MD, who specializes in Allergy and Immunology, authored a medical evaluation on May 16, 2022.  Dr. Gerrish identified medically determinable impairments of non-severe depressive, bipolar, and related disorders, as well as non-severe osteoarthritis and allied disorders.  Dr. Gerrish opined that McCarty does not have a severe physical impairment and does not appear to have any significant physical functional limitations. (Tr. 59-62).

At the reconsideration level, state agency examiner Victoria L. Hogan, MD, who specializes in Emergency Room Medicine, authored a medical evaluation on April 7,

2023. Dr. Hogan opined McCarty could occasionally lift and carry up to 50 pounds and frequently lift and carry up to 25 pounds. He could engage in unlimited pushing and pulling with his upper lower extremities. He could stand and/or walk for a total of six hours in an eight-hour workday, and he could sit for a total of six hours in an eight-hour workday. He could never climb ladders, ropes, or scaffolds, but he could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He experienced no manipulative, visual, or communicative limitations. He should avoid all exposure to hazards such as machinery or heights. He should avoid concentrated exposure to vibrations and extreme hear and cold. He could tolerate unlimited exposure to wetness, humidity, noise, fumes, odors, dusts, gasses, and poor ventilation. (Tr. 66-77).

The foregoing review portrays the existence of substantial evidence supporting the ALJ's determination regarding McCarty's RFC vis-à-vis his physical impairments. From August 2021 to June 2022, McCarty complained of pain in his neck, shoulders, and back, and his physicians routinely prescribed physical therapy and occasionally prescribed Mobic. (Tr. 309). In April 2022, McCarty reported difficulty lifting, squatting, bending, reaching, talking, completing tasks, concentrating, remembering, and getting along with others. (Tr. 233). However, he recounted he could walk two miles before needing to stop and rest for 10 minutes. (*Id.*). The record also reflects McCarty could manage his physical pain without the use of medication, assistive devices, injections, or surgery.

On June 22, 2022, a week after his most recent complaint of pain, McCarty reported not feeling any pain in his back, neck, or shoulders. (Tr. 331). In addition, he continued to report feeling little to no pain, and he had trouble pinpointing pain throughout his physical therapy sessions. (*Id.*). Further, his physical therapist noted that McCarty wanted "to talk more than exercise." (*Id.*). In late July 2022, McCarty reported he did not feel increased pain while he exercised, and he exhibited no limitations in his range of movement, which he had complained about earlier in the month. (Tr. 461, 463-64, 468-72). Upon discharge from physical therapy, McCarty reported he felt no pain and had "excellent" functional improvement after eight appointments. (Tr. 472). Thus, the record demonstrates that prescribed physical therapy mitigated McCarty's physical pain.

To be sure, Dr. Gill noted the presence of multilevel degenerative disc disease upon reviewing McCarty's cervical spine X-ray, and he referenced a 2015 MRI exhibiting degenerative disc disease in the lumbar region. (Tr. 495). However, Dr. Gill's exam noted McCarty ambulated normally; his eyes, ears, neck, chest, cardiovascular system, and abdomen appeared normal; and his gait, neck, range of motion in joints, strength, hands, back, legs, and muscle tone appeared normal. (*Id.*).

Moreover, despite McCarty testifying he had "trouble standing or walking." (Tr. 46), and reporting he had joint pains all over his body that "seemed to move around every day," (Tr. 494), record evidence indicates he remained active during the relevant

period, as he could walk for a mile or two, or 20 minutes, before stopping to rest. (Tr. 232-33, 254).

Regarding McCarty's injury to his foot in April 2022, he returned for reevaluation due to continued discomfort for months after the incident. (Tr. 359, 410, 420). The doctor prescribed physical therapy. (Tr. 433). He denied feeling any pain in his foot, whether he was walking or resting. (Tr. 442). Upon completing physical therapy, McCarty manifested no functional limitations and felt no pain. (Tr. 453).

The ALJ also properly evaluated the medical source opinions of state agency consultants Prianka Gerrish, M.D and Victoria L. Hogan, M.D. *See* 20 C.F.R. § 404.1513a(b)(1) (ALJ should consider opinions from state agency medical consultants like other medical evidence, as such consultants "are highly qualified and experts in Social Security disability evaluation"). The ALJ considered the experts' opinions and did not find Dr. Gerrish's opinions persuasive because Dr. Gerrish believed McCarty does not have a severe physical impairment. (Tr. 22). Nevertheless, the ALJ found Dr. Hogan's finding persuasive, stating "it is consistent with the record as a whole," and it included "appropriate reference[s] to the record to support her opinion." (*Id.*). Upon her medical evaluation, Dr. Hogan opined McCarty could perform medium work, except for frequently climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; avoiding concentrated exposure to temperature extremes and vibration; and avoiding all exposure to workplace hazards. (Tr. 74-75). Thus, the ALJ accounted for the experts' opinions in

his RFC assessment to the extent they fully accorded with his own conclusions vis-à-vis McCarty's limitations. (*See* Tr. 19). Principally, Dr. Hogan's opinions, to the extent relied upon in the ALJ's opinion, constitute substantial evidence supporting the ALJ's FRC determination.

Though aspects of the record certainly confirm symptoms of neck, back, and shoulder pain, McCarty reported improved symptoms after physical therapy, and he exhibited normal findings during several examinations. Thus, the record contains substantial evidence buttressing the ALJ's evaluation of McCarty's RFC regarding his physical pain and subjective assessments of such.

## II.    SUBSTANTIAL    EVIDENCE    SUPPORTS    THE    ALJ'S DETERMINATON REGARDING MCCARTY'S RFC AS TO HIS MENTAL AILMENTS

The foregoing result manifests as well for McCarty's challenge to the ALJ's RFC as to McCarty's mental impairments.

McCarty visited Covenant Counseling and Consulting (hereinafter "CCC") three times with Dr. Joe Beltran as his provider. On September 24, 2021, McCarty stated he felt depressed and endeavored to discuss his experience with sexual abuse. McCarty displayed full orientation; appropriate behavior, dress, and general appearance; normal speech; depressed mood; congruent affect; fair insight and judgment; intact memory; variable concentration and attention; circumstantial thought process; preoccupied thought content; unremarkable perception; and intact functional status. (Tr. 312). Dr.

Beltran also noted McCarty received counseling several times in the past, with the most recent visit occurring in March 2021 when he saw a psychiatrist. McCarty reported his medical conditions include arthritis and varicose veins. Dr. Beltran diagnosed McCarty with an unspecified depressive disorder and an unspecified personality disorder. (Tr. 313). Dr. Beltran also noted further treatment could continue "as-needed." (Tr. 314).

McCarty returned to Dr. Beltran on October 15, 2021. (Tr. 315). Dr. Beltran described McCarty as "fairly talkative and experienc[ing] difficulty focusing on any specific topic." (Tr. 316). The report also noted McCarty desired to file for disability due to his "chronic condition." (*Id.*). Further, Dr. Beltran reported McCarty "does not seem to have a history of treatment compliance and does not seem to be focused on receiving treatment." (*Id.*). McCarty informed Dr. Beltran he may return "in a month or so." (*Id.*).

McCarty returned to Dr. Beltran on December 31, 2021. (Tr. 317). According to the report, Dr. Beltran's main objectives include providing information on depressive disorders to McCarty and developing his coping skills effectively (*Id.*).

McCarty returned to CCC on June 1, 2022, and received treatment from Carrie Jones. McCarty displayed full orientation, appropriate behavior, normal speech, euthymic mood, congruent affect, fair insight, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status. (Tr. 344). In McCarty's progress notes, Jones described his thoughts as disorganized and random. (Tr. 345). She also

noted McCarty discussed the past "as if it were recent events." (*Id.*). The report indicated McCarty would continue to see Dr. Beltran to work on efficient coping mechanisms. (*Id.*).

On June 3, 2022, McCarty presented at Integrated Behavioral Health (hereinafter "IBH") for a general psychiatric evaluation. McCarty presented with complaints of grief and desired "verification of his [symptoms] so [he] can give it to social security and disability." (Tr. 321). His goals included obtaining help and identifying someone "he can vent to." (*Id.*). McCarty graded his depression five out of ten, with ten being the most severe, and he noted his symptoms are longstanding and recurring. (*Id.*). McCarty denied past and contemporaneous suicidal and self-harming behaviors. (Tr. 322). McCarty rated his anxiety level as moderate at a level six out of ten. He also chronicled experiencing multiple panic episodes, with the most recent episode occurring in 2019, but he also characterized the occurrence of panic attacks as rare. He denied symptoms of hyper-arousal, hypervigilance, becoming easily startled, avoidance, trauma symptoms. McCarty denied and does not currently present disorganized speech, behavior, or negative symptoms. He also denied any childhood abuse, but he stated he grieves over "unfulfilled dreams," and he chronicles being a rape victim. (*Id.*). McCarty denied any symptoms of failing to give attention to details or to sustaining attention. (*Id.*).

During the mental status exam, the psychiatric nurse practitioner noted McCarty's behavior as cooperative, calm, and pleasant; deemed his thought process as

coherent; and described his recent and remote memory as grossly intact.  The nurse practitioner assessed McCarty with recurrent and major depressive disorder, general social anxiety, and general anxiety.  She prescribed 10 mg of Citalopram Hydrobromide for depression, and she ruled out personality disorder and Bipolar 2 disorder.  She also ruled out McCarty having a personality disorder, as well as Bipolar 2 disorder. (Tr. 324).

On June 15, 2022, McCarty met with a counselor at CCC. (Tr. 346).  The counselor described McCarty's mood as anxious and depressed. (*Id.*). She assessed his anxiety level as a seven out of ten and his depression as a four out of ten.  (Tr. 347).  McCarty stated he returned to counseling because he had "a claim with Social Security," and he "need[ed] to vent." (*Id.*).  When asked to identify the goals he desired to accomplish while in counseling, McCarty responded, "I think I'd be happier in Tennessee." (*Id.*). McCarty expressed his willingness to participate in additional counseling sessions.  Cauthen reported McCarty made no progress throughout his sessions.  She scheduled an individual session with McCarty on June 29, 2022, and recommended treatment every 3 to 4 weeks.

McCarty returned to IBH for a follow-up appointment with the nurse practitioner on June 30, 2022. (Tr. 508). The progress notes reported that McCarty self-discontinued his psychiatric medications and described him as "a purist" who does not "like to mess with [his] chemical biology." (Tr. 509).  Even so, McCarty requested Valium or Placidyl, though the nurse practitioner suggested he try other medical options for anxiety.  The mental exam reflected previous findings, though the doctor noted that

McCarty appeared "sad." (*Id.*). The nurse practitioner ruled out a personality disorder, and she did not deem a follow-up appointment necessary because McCarty expressed a desire for psychotherapy rather than medication. (Tr. 510-11).

On August 19, 2022, McCarty presented for a counseling appointment at CCC. (Tr. 479). The counselor assessed full orientation, appropriate behavior, normal speech, depressed mood, congruent affect, fair judgment and insight, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status. (*Id.*). McCarty reported he continued to struggle with his depression, and he conveyed his thoughts in a scattered manner, jumping to different topics throughout. (Tr. 479). He reported having "a few friends who are good support to him." (*Id.*). When the counselor gave McCarty an exercise to complete, McCarty had trouble staying on task. (*Id.*). The counselor reported McCarty made no progress. (*Id.*).

On October 7, 2022, McCarty participated in a telehealth session with a CCC counselor. The counselor described McCarty as verbose, with fairly clear and organized thoughts, and "a learned helplessness." (Tr. 477). McCarty stated he felt depressed, anxious, and suspected "PTSD" from all of his trauma. (*Id.*). The progress notes stated McCarty made no progress in his treatment. (*Id.*).

McCarty participated in a second CCC telehealth appointment on October 17, 2022. He denied any improvement with his "PTSD features," and stated he

experienced nightmares, flashbacks, and hypervigilance. (Tr. 478). McCarty declined a psychological evaluation. Yet again, the counselor reported no signs of progress. (*Id.*).

After almost a two-month lapse in therapy, McCarty participated in another CCC telehealth appointment on December 13, 2022. (Tr. 484). He expressed clear and fairly organized thoughts. (*Id.*). He easily engaged with the counselor during the session and started to process his feelings from his past. (*Id.*). However, the counselor noted McCarty made no progress during this appointment. (*Id.*).

McCarty participated in another CCC telehealth session on December 27, 2022. He expressed clear and fairly organized thoughts. He stated he continued to struggle with depression at times, but he spent some time with friends during the holidays. McCarty also reported he joined the waitlist for housing in the Nashville, Tennessee area, and he began to consider "employment options as a 'counselor assistant.'" (Tr. 485). The counselor reported McCarty denied any improvements with his "PTSD," denied any updates with his disability, experienced trouble falling asleep, and stated he did not attempt to join or find a small group. (*Id.*). According to the counselor's report, McCarty demonstrated no signs of progress. (*Id.*).

On February 22, 2023, McCarty saw Dr. Yelena Chistyakova from IBH for symptoms of depression and grief. McCarty stated he coped with stress by exercising, spending time with family and friends, and relying upon his faith. McCarty rated his depression at a level five out of ten and his anxiety a level six out of ten, which mirrored his assessments in June 2022. He also noted trouble sleeping and complained it takes

30 minutes to fall asleep. McCarty remarked he could manage his symptoms without medication treatment. Dr. Chistyakova assessed major depressive disorder, generalized social phobia, generalized anxiety disorder, and primary insomnia. (Tr. 504-05).

McCarty followed up with Dr. Chistyakova on March 20, 2023, stating he felt anxious and depressed. McCarty reported sleeping better, yet falling asleep still took "a long time." (Tr. 500). He rated his depression a level four out of ten and his anxiety at a level five out of ten. (*Id.*). Dr. Chistyakova described McCarty's insight as poor to fair. (Tr. 501).

State agency assessor Eric Wiener, Ph.D., authored a medical evaluation on May 14, 2022. Weiner assessed mild limitations on McCarty's abilities to understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage himself Further, Wiener noted McCarty's ability to complete an ADL form with good detail, suggesting no significant cognitive issues. Thus, Wiener found McCarty had secondary psychological issues, which impose some, yet not severe, limitations. (Tr. 62-64).

At the reconsideration level, Robert L Bare, Ph.D., authored a medical evaluation on February 10, 2023. Bare reported that McCarty could understand, remember, and carry out simple routine tasks over a normal workday and week, and he could perform simple daily activities without any significant issues, though he might experience moderate limitations in understanding and remembering detailed instructions. Bare opined McCarty can concentrate for at least two hours at a time, which is required to

perform simple tasks at work.  McCarty can maintain appropriate superficial social interactions in work settings where completion of tasks requires only casual and infrequent contact with coworkers and the general public, and he should have direct but non-confrontational supervision.  He may tolerate infrequent, yet gradual, changes within the workplace.  Bare concluded McCarty did not suffer extreme or marked functional limitations, and McCarty retained the capacity to perform simple, routine, and repetitive tasks at a non-production pace in a position with reduced social demands. (Tr. 77-79).

On May 1, 2023, McCarty followed up at IBH with Dr. Chistyakova.  He reported sleeping better and feeling calmer since taking Gabapentin.  He reported his anxiety and depression levels as a four out of ten.  Dr. Chistyakova described McCarty's mood as neutral and congruent, with poor to fair insight, grossly intact memory and knowledge, normal perception, anxious thought content, tangential thought process, negative ruminations, and full orientation.  Dr. Chistyakova assessed major depressive disorder, generalized social phobia, generalized anxiety disorder, and primary insomnia, and she instructed McCarty to follow up quarterly. (Tr. 496-98).

McCarty saw a CCC counselor on July 19, 2023.   The counselor diagnosed McCarty with PTSD and major depressive disorder, in addition to the prior diagnosis of a personality disorder.  The counselor detected full orientation, appropriate behavior, normal speech, euthymic mood, congruent affect, fair insight and judgment, intact memory, good attention and concentration, unremarkable thought process, appropriate

thought content, unremarkable perception, and intact functional status.    McCarty stated he desired to heal from past events,  and he felt a "demonic influence occurring with him." (Tr. 519-520). McCarty stated he socially isolates himself and enjoys being alone.   He also stated that his friend "tries to use [him] for a ride all of the time" to go eat. (Tr. 520). The progress notes observe McCarty seemed "open and receptive" to the work done during the appointment. (*Id.*).

McCarty saw the same counselor via telehealth on August 2, 2023.   McCarty appeared positive and reported "maintaining" his symptoms of depression and PTSD since his last session. (Tr. 524).  The counselor noted McCarty desired to return to work and socialize with others because he "needs companionship." (*Id.*). The counselor addressed and reviewed McCarty's problems and established different exercises to help him.  The counselor noted McCarty's ability to maintain progress with the treatment plan. (Tr. 525).  The counselor detected full orientation, appropriate behavior, normal speech, euthymic mood, congruent affect, fair insight and judgment, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status.  (Tr. 524).

On August 17, 2023, the same counselor noted McCarty appeared positive and reported maintaining his symptoms "fairly" since his last appointment. (Tr. 527). McCarty also stated that his symptoms remain the same, though, and he continued to socially isolate himself. (Tr. 528). The counselor's plan for future appointments included exploring relationship patterns and developing McCarty's individual coping

33

skills. The counselor characterized McCarty's progress as "maintained." (*Id.*). The counselor detected full orientation, appropriate appearance and dress, unremarkable motor activity, appropriate interview behavior, normal speech, euthymic mood, congruent affect, fair insight and judgment, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status. (Tr. 527).

The foregoing records, considered as a whole, provide substantial evidence to support the ALJ's RFC determination, and the ALJ properly cited objective medical evidence refuting the severity of McCarty's alleged mental health symptoms.

Regarding his mental impairments, McCarty testified he felt "stressed to the bone," "emotionally and physically and mentally burned out," and "hurting all over mentally." (Tr. 40).

McCarty alleged he has difficulty remembering and completing tasks, but he also testified he could perform household chores, such as making the bed, doing laundry, shopping, driving, and paying bills. (Tr. 229-233, 250-52, 254). Further, as the ALJ observed, McCarty's mental health treatment notes demonstrate he has the ability to provide information regarding his work history, follow instructions from his physicians and physical therapists, and respond appropriately when asked questions. (Tr. 18-19).

McCarty alleged he experiences difficulty getting along with others, especially his neighbors and brother-in-law. (Tr. 44, 232, 253). However, McCarty also describes himself as "a people lover," and testified he spends time with friends and family and

talks on the phone daily. (Tr. 43, 232, 253).  Moreover, as the ALJ noted, McCarty's mental health treatment notes reflect he maintains good rapport with his providers, and appears comfortable interacting with staff, who described him as pleasant. (Tr. 18-19; *see* Tr. 324, 335).

McCarty alleged limitations in his ability to concentrate and complete tasks. However, he chronicled he can drive independently, prepare his own meals, manage his funds and medical care, and watch television. (Tr. 229-232, 250-53). Regarding his ability to adapt and take care of himself, McCarty contended he has difficulty handling change. (Tr. 234, 255). However, the record evidence depicts McCarty continually presents himself as well-groomed, has good hygiene, and independently cares for his cats. (Tr. 229, 250).

Substantial evidence also supports the ALJ's assessment of the medical source opinions of state agency consultants Eric Wiener, Ph.D. and Robert L. Bare, Ph.D. The ALJ did not find Dr. Weiner's opinions persuasive because he opined McCarty does not have a severe mental impairment.   However, the ALJ found Dr. Bare's opinion mostly persuasive, except for his opinions on McCarty's social limitations as the record does not support them.  Thus, the ALJ accounted for the experts' opinions in his RFC assessment to the extent they fully accorded with his own conclusions vis-à-vis McCarty's limitations. Dr. Bare's opinions, to the extent the ALJ incorporated them into his opinion, constitute substantial evidence supporting the ALJ's RFC determination. (Tr. 22-23).

Therefore, substantial evidence supports the ALJ's determination regarding McCarty's RFC and the assessment of his subjective complaints.

## III.   MCCARTY'S CONTENTIONS DO NOT MAR THE ALJ'S FINDINGS

The ALJ discussed many – though certainly not all – of the foregoing records. Accordingly, McCarty asserts the ALJ selectively evaluated the medical records and failed to consider evidence consistent with his own allegations. *See Robinson v. Colvin,* No. 5:12-cv-1954-AKK, 2014 WL 22142942, at *5 (N.D. Ala. May 28, 2014) ("[I]t was unreasonable for the ALJ to rely only on the small snapshot of treatment notes that showed improvement immediately after [claimant's] back surgery, and to ignore the later notes outlining the return of the [claimant's] pain.").

As an initial matter, the ALJ need not explicitly discuss every potential relevant medical record. *See Brito v. Comm'r, Soc. Sec. Admin.,* 687 F. App'x 801, 804 (11th Cir. 2017) ("Although [claimant] points to other evidence in the record that was consistent with her hearing testimony and to which the ALJ did not specifically refer in making her credibility determination, the ALJ was not required to examine or reference every piece of evidence, so long as it is evident, as it is here, that the ALJ considered [her] medical condition as a whole.").

And contrary to McCarty's contention, the ALJ did not cherry-pick the records to support his own conclusion. First, the ALJ did not improperly disregard evidence buttressing McCarty's testimony. In fact, he noted several instances in which McCarty

complained of adverse symptoms. For instance, the ALJ cited records prior to the alleged onset date wherein McCarty's MRI from 2015 displayed degenerative disc disease (Tr. 494). Moreover, the ALJ acknowledged McCarty's complaints of neck and back pain, as well as "tenderness to palpation over the right upper and mid cervical region." (Tr. 20). Furthermore, the ALJ recognized that McCarty suffers from severe mental impairments, including depression, PTSD, and a personality disorder. (Tr. 17).

Relatedly, McCarty faults the ALJ's characterization of his daily activities in rendering his adverse credibility determination. (Doc. 9, at 13). According to McCarty, the ALJ improperly described his daily living activities without acknowledging the corresponding limitations articulated in his testimony.  Relying on *Horton v. Barnhart*, 469 F. Supp. 2d 1041 (N.D. Ala. 2006), McCarty contends the ALJ improperly dismissed the qualifying limitations he described. (*See* Doc. 9 at 14) ("He lives alone and keeps his house together. He explained he does not cook… Treatment notes show [he] reported that he continued to socially isolate himself. In fact, a treatment note indicated [his] symptoms were preventing him from keeping up with his household." (citations omitted)).  Although the ALJ did not recite certain limitations McCarty highlights, such omissions do not undermine the substantial evidence buttressing his decision.

The ALJ may consider the claimant's daily activities as one factor in evaluating subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3)(i); *Majkut v. Comm'r of Soc. Sec.,* 394 F. App'x 660, 663 (11th Cir. 2010) ("Although a claimant's admission that she participates in daily activities for short durations does not necessarily disqualify the

claimant from disability, that does not mean it is improper for the ALJ to consider a claimant's daily activities at all."); *Harrison v. Comm'r of Soc. Sec.,* 569 F. App'x 874, 880 (11th Cir. 2009) (finding the claimant's daily activities of managing his personal care, preparing meals, shopping, caring for pets, watching television, using a computer, and socializing with others supported ALJ's credibility determination).

In *Horton,* the court noted the ALJ erred by selectively and disingenuously describing the claimant's daily living activities in rendering his adverse credibility determination, "as he accept[ed] her listing of her activities, but not her limiting description of them." *Horton,* 469 F. Supp. 2d at 1047. More specifically, the ALJ noted the claimant could drive a car and perform household chores; however, he omitted reference to the claimant's qualification that she could not drive far distances, and she performed chores "infrequently and sporadically, taking much longer to complete." *Id.* at n.2. The court thus concluded substantial evidence failed to support the ALJ's justifications for discrediting the claimant's testimony. *Id.* at 1047.

Significantly, however, apart from his "disingenuous" description of the claimant's daily living activities, the only evidence the ALJ in *Horton* latched onto to support his adverse credibility determination constituted a physician's opinion, which the court concluded the ALJ improperly rejected. *Id.* at 1045-47. Thus, the ALJ erroneously evaluated the claimant's subjective complaints in *Horton* because "the ALJ relied entirely on the [claimant's] daily activities in rejecting her pain testimony and allegation of debilitating pain, after improperly rejecting an opinion of the plaintiff's

physician." *Hart v. Soc. Sec. Admin.,* No. 5:19-cv-00811-SGC, 2021 WL 961786, *6 (N.D. Ala. Mar. 15, 2021) (discussing the narrow context of the court's reasoning in *Horton*).

The court does not confront the same deficiencies in the case at bar because the ALJ properly detailed medical records evincing substantial evidence for the determination that McCarty's symptoms do not preclude employment. *See Hunter v. Colvin,* No. 4:13-CV-0391-SLB, 2014 WL 4458887 (N.D. Ala. Sept. 8, 2014) (contrary to the ALJ's conclusion, the claimant's daily living activities did not undermine her subjective complaints; however, substantial evidence nevertheless buttressed the ALJ's decision because he also relied upon sufficient objective medical evidence to render his adverse credibility determination). Accordingly, the ALJ's decision in the instant case does not manifest the concerns at issue in *Horton*.

The decision in *Iheanacho v. Berryhill*, No. 6:17-cv-0910-MHH, 2018 WL 4680173 **8-9 (N.D. Ala. Sept. 28, 2018), presents similarly distinguishable circumstances. Among other examples, the ALJ ignored testimony demonstrating the claimant completed household chores infrequently and with great difficulty. As such, the court found the "ALJ's brief summary of Ms. Iheanacho's daily activities does not represent solely the limitations caused by Ms. Iheanacho's pain." *Id.* at *9. That said, the court *also* concluded the ALJ improperly characterized the objective medical evidence. *Id.* at *4-7. Procedurally, therefore, the court could not "affirm the ALJ's decision based solely on her evaluation of Ms. Iheanacho's daily activities." *Id.* at *8.

By contrast, the ALJ's evaluation of McCarty's daily activities follows a determination, based on substantial evidence, that the objective medical evidence did not support McCarty's allegations of disabling symptoms. *See Garcia v. Kijikazi,* No. 5:22-cv-1396-LCB, 2023 WL 8439742, *5 (N.D. Ala. Dec. 5, 2023) ("[I]t is apparent that the ALJ did not rely *solely* on [the claimant's] reported daily activities in finding that she was not disabled. Accordingly, [the ALJ's] decision was not in violation of the rules discussed in *Horton* and *Iheanacho*.") (emphasis in original). That is, the evidence regarding McCarty's daily living activities did not constitute the sole justification for the ALJ's adverse credibility determination. As elaborated previously, the ALJ buttressed his determination with a discussion of medical evidence undermining the conclusion McCarty sustains disabling symptoms. Accordingly, the ALJ's decision rests upon substantial evidence. *See Strickland v. Comm'r of Soc. Sec.,* 516 F. App'x 829, 832 (11th Cir. 2013) (the claimant's daily living activities, coupled with her medical evidence, supported the ALJ's adverse credibility determination); *Dryer v. Barnhart,* 395 F. 3d 1206, 1212 (11th Cir. 2005) (the ALJ properly considered the claimant's subjective complaints of pain); *Hart,* 2021 WL 961786, at *7 (Although the ALJ did not delineate the specific limitations associated with the claimant's reported daily activities, he nevertheless properly assessed her credibility because his reference to her daily living activities "was preceded by a lengthy discussion on how the objective medical evidence and treatment notes" belied her allegations of disabling pain.); *Eubanks v. Berryhill,* No. 5:16-CV-1487-VEH, 2017 WL 5187835 at *3-4 (N.D. Ala. Nov. 9, 2017) (substantial evidence

supported the ALJ's credibility assessment because he properly considered the claimant's daily living activities together with the objective medical evidence); *Davis-Baker v. Colvin,* No. 1:14-cv-1854-AKK 2015 WL 3833819 (N.D. Ala. June 22, 2015) (substantial evidence buttressed the ALJ's adverse credibility determination because the ALJ did not mischaracterize the evidence vis-à-vis a claimant's daily living activities, nor did he improperly rely solely upon he claimant's daily living activities to assess her credibility as he analyzed the objective medical evidence.).

Moreover, based upon the statements in McCarty's Function Report and hearing testimony, the ALJ's description of daily living activities manifests as neither selective nor disingenuous. That is, McCarty's stated limitations do not bear consistency with evidence in the record of his ability to live independently within the household, tend to personal care, shop, or spend time with neighbors.

Regarding performing household chores and his ability to pay attention for two hours at a time, McCarty's stated limitations conflict with his own accounts of daily activities. At the evidentiary hearing. McCarty testified his day consists of doing household chores, such as laundry and making the bed, and yardwork. McCarty reported caring for his cats independently. Furthermore, he explained he enjoys researching psychological issues, and he can pay attention for two hours at a time. (Tr. 43-44). In a Function Report completed on April 4, 2022, McCarty reported having the ability to walk two miles and taking friends out to eat. (Tr. 232-33). In a Function Report

dated October 24, 2022, McCarty reported the ability to walk one mile shop in stores every three days, enjoy his hobbies, and talk on the phone. (Tr. 254).

Thus, McCarty fails to establish the ALJ's discussion of his daily activities renders improper his assessment of his subjective complaints. Although the ALJ did not recite each limitation McCarty included in his testimony, he accurately summarized the relevant portions of the hearing and fairly represented the pertinent statements in the Function Report. *See Byars v. Colvin*, No. 6:15-CV-00303-KOB, 2016 WL 4137981, *11 (N.D. Ala. Aug. 4, 2016) (in discussing the claimant's pain allegations, the ALJ did not improperly omit the claimant's testimony regarding specific limitations on her daily living activities because her Function Report contradicted her testimony).

In sum, McCarty has not successfully undermined the substantial evidence supporting the ALJ's RFC assessment. Although McCarty maintains his symptoms limit him to a greater degree than the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel,* 631 F.3d at 1178 (citations and internal quotation marks omitted). Thus, the ALJ did not err in assessing McCarty's subjective complaints, and McCarty's contrary interpretation of the evidence does not warrant reversal.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 4th day of September, 2025.

_____

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE